174 P.3d 320

**In the Matter OF the CONTESTED CASE HEARING ON the WATER USE PERMIT APPLICATION FILED BY KUKUI (MOLOKAI), INC.**

No. 24856.

Supreme Court of Hawai'i.

Dec. 26, 2007.

Jon M. Van Dyke, on the briefs, for Intervenor–Appellant Office of Hawaiian Affairs.

Clayton Lee Crowell, Deputy Attorney General, on the briefs, for Intervenor–Appellant Department of Hawaiian Home Lands.

Alan T. Murakami and Moses K.N. Haia, III, of Native Hawaiian Legal Corporation, Honolulu, on the briefs, for Intervenors–Appellants Judy L. Caparida and Georgina Kuahuia.

Jean Polhamus Creadick, Deputy Attorney General, on the briefs, for Appellee Commission on Water Resource Management.

Alan M. Oshima, Randall K. Ishkawa and Scott T. Miyasato, of Oshima Chun Fong & Chung, LLP, Honolulu, on the briefs, for Applicant–Appellee Kaluakoi Land, LLC.

MOON, C.J., LEVINSON, NAKAYAMA, and ACOBA, JJ., and Circuit Judge SAKAMOTO, in place of DUFFY, J., recused.

Opinion of the Court by NAKAYAMA, J.

The present matter involves multiple appeals from the December 19, 2001 final decision and order of the Commission on Water Resource Management ("the Commission") approving Kukui (Moloka'i), Inc.'s ("KMI's") application for water use permits. On appeal, intervenor-appellants (collectively referred to as "Appellants") Department of Hawaiian Home Lands ("DHHL"), Office of Hawaiian Affairs ("OHA"), and Judy Caparida ("Caparida") and Georgina Kuahuia ("Kuahuia") generally allege multiple violations of the Commission's public trust duties under the Hawai'i Constitution, the State Water Code ("Code"), and the public trust doctrine. Specifically, the Appellants raise the following points of error.

DHHL asserts that: (1) the Commission failed to recognize that the preservation of a sufficient and accessible water supply for the current and future development of Hawaiian Home Lands is a distinct public trust "use"; (2) the Commission failed to apply even minimal scrutiny to KMI's request to divert public trust resources; (3) the Commission erroneously placed the burden of proof on DHHL to produce "conclusive evidence" of harm to the public trust resources; (4) the Commission's decision to grant KMI's application, subject to recall or modification if it is later demonstrated that the public trust resources have been harmed, violated the precautionary principle; (5) the Commission exceeded its statutory authority by considering an untimely existing use application; (6) the Commission lacked authority to grant new or proposed uses at a hearing to determine existing uses; and (7) the Commission lacked authority to grant existing uses that were not claimed in KMI's application.

OHA contends that: (1) the Commission erred by allocating water for "proposed uses" during proceedings to determine existing uses; (2) the Commission erred by concluding that KMI had correlative rights to transfer ground water; (3) the Commission erred by not utilizing the precautionary principle espoused by this court in *In re Water Use Permit Applications*, 94 Hawai'i 97, 9 P.3d 409 (2000) ("*Waiahole I*"); (4) the Commission erred by concluding that DHHL's constitutional water reservation was not an "existing use" and thus did not limit the granting of other permit applications; (5)

the Commission erred by ignoring the fact that KMI's hotel and golf course closed, thus eliminating the "purpose" of the water sought; and (6) the Commission's utilization of Attorney Yvonne Y. Izu created a direct conflict of interest requiring vacatur of the Commission's final decision and order.

Caparida and Kuahuia argue that: (1) the Commission failed to comply with the five-year deadline set forth in Hawai'i Revised Statutes ("HRS") § 174C–50(g), thus rendering its application of HRS § 174C–50(b) inappropriate; (2) the Commission erred by approving new uses insofar as KMI represented that its application was only for existing uses; (3) the Commission erroneously concluded that KMI's proposed use would have no measurable impact on traditional and customary gathering rights of native Hawaiians; (4) the Commission erred by failing to recognize DHHL's constitutional water reservation as an "existing legal use" and concluding that KMI's request could be accommodated without compromising the reservation or exceeding the sustainable yield of the Kualapu'u aquifer; and (5) the Commission erred by denying their motions to (a) reopen the record to receive information regarding the closing of KMI's hotel and golf course, and (b) continue the October 17, 2001 hearing until the foregoing information could be incorporated into the parties' arguments and considered by the Commission.

For the following reasons, we hold that: (1) DHHL's reservation is a public trust "purpose" and not an "existing legal use"; (2) the Commission failed to adequately scrutinize KMI's request to divert water; (3) the Commission appears to have placed the burden of proof on DHHL to demonstrate that pumpage at KMI's well would increase the chloride concentration at the DHHL well site; (4) the Commission's decision did not violate the precautionary principle; (5) the

Commission erred by considering an untimely application; (6) KMI requested both existing and new uses; (7) pursuant to HRS § 174C–49(c), KMI may transport water from Well # 17; (8) the Commission erred when it failed to consider the impact that the closing of the hotel and golf course would have on its allocation of water to KMI; and (9) the Commission impermissibly shifted the burden of proving harm to those claiming a right to exercise a traditional and customary native Hawaiian practice.

Accordingly, we vacate the Commission's December 19, 2001 final decision and order, and remand the matter for further proceedings consistent with this opinion.

## I. BACKGROUND

On May 13, 1992, the Commission designated the island of Moloka'i as a Water Management Area. The Commission's designation took effect on July 15, 1992, thereby triggering a one-year period [1] during which users were required to file applications for a permit to continue any pre-existing "withdrawal, diversion, impoundment, or consumptive use of water[.]" HRS § 174C–48(a) (Supp.1992).

On June 8, 1993, Moloka'i Irrigation System and Moloka'i Ranch submitted an initial joint application for a water use permit to divert water from Well # 17 (Well No. 0901–01) for use at the Kaluako'i Resort and Kualapu'u Town. Moloka'i Ranch owned the land overlying Well # 17 at that time. However, on October 19, 1993, ownership of the land was transferred to KMI. On December 15, 1993, KMI submitted its own application requesting a permit authorizing the use of 2.0 million gallons of water per day ("mgd").

On April 14, 1994, the Commission staff recommended that the Commission consider KMI's submittal as a late filing, pursuant to

---

1. HRS § 174C–50(c) (Supp.1992) provides as follows:

An application for a permit to continue an existing use must be made within a period of one year from the effective date of designation. Except for appurtenant rights, failure to apply within this period creates a presumption of abandonment of the use, and the user, if the user desires to revive the use, must apply for a permit under section 174C–51. If the commis-

sion determines that there is just cause for the failure to file, it may allow a late filing. However, the commission may not allow a late filing more than five years after the effective date of rules implementing this chapter. The commission shall send two notices, one of which shall be by registered mail, to existing users to file for an application for a permit to continue an existing use.

HRS § 174C–50, insofar as it was not filed within one year of the July 15, 1992 effective date of the Commission's Water Management Area designation. Nevertheless, the staff recommended that the Commission find good cause for the late filing based upon the following:

The applicant has stated that the deed to the land was in the process of being transferred at about this time. He did not foresee the unexpected delays caused by three changes in the management staff of the party selling the property. He has stated that, as soon as the transfer was secure, he was able to sign as landowner, thereby allowing his submittal of a completed application to the Commission. Staff finds these reasons to be just cause for a late filing.

On March 14, 1995, following several revisions, the Commission staff recommended that the Commission authorize an interim use of 871,420 gallons per day ("gd"). The Commission voted to accept the staff's recommendation. The Commission filed its notice of action on March 30, 1995. KMI thereafter filed a motion for reconsideration and also appealed the March 14, 1995 decision to this court and the second circuit court. KMI's motion for reconsideration was denied on June 14, 1995, and its appeals to this court and the second circuit court were dismissed for lack of appellate jurisdiction.

On May 21, 1996, the Commission reviewed a staff recommendation to amend the interim existing use allocation and authorize 1.169 mgd. Following public comment, the Commission voted to reject the staff's recommendation and reaffirm the March 14, 1995 interim existing use allocation of 871,420 gd. KMI thereafter requested a contested case hearing on the matter.

The contested case proceedings commenced on November 23, 1998, before hearings officer Peter Adler ("Adler"). On May 15, 2000, following the evidentiary portion of the proceedings, the Commission filed its "Proposed Findings Of Fact, Conclusions Of Law, And Decision And Order[.]" On July 31, 2000, DHHL, OHA, KMI, and Caparida and Kuahuia filed their respective exceptions.[2] On October 15, 2001, Caparida and Kuahuia filed a "Motion For Reopening Of Record And Continuance Of Argument On Exceptions To Hearing Officer's Proposed Decision And Order" based upon a discrepancy between the actual metered water uses reported by KMI and certain information provided by Molokai Public Utilities, a subsidiary of KMI.[3]

The Commission filed its "Findings Of Fact, Conclusions Of Law, And Decision And Order" on December 19, 2001.[4] Therein, the Commission denied Caparida and Kuahuia's motion, and awarded KMI an existing use permit, pursuant to HRS § 174C–50, authorizing the withdrawal and reasonable and beneficial use of 936,000 gd. The Commission further awarded KMI a permit for proposed uses, pursuant to HRS § 174C–49(a), authorizing the withdrawal and reasonable and beneficial use of 82,000 gd. Given that the sustainable yield of the Kualapuʻu aquifer was close to full allocation, the Commission subjected both permits to the following special conditions:

1 If there are significant or unexpected increases in chlorides or drawdowns in the two DHHL wells, the DWS well, or KMI's Well 17, substantially in excess of what they were on the effective date of designation, any party may petition the Commission, or the Commission may on its own motion, order a show cause hearing as to why the permitted amounts of withdrawal of water should not be reduced along with lawful and equitable reductions in pumpage from other wells in the Kualapuʻu Aquifer.

2 The approximately 100,000 [gd] of water used to clean the filters through back washing near the Moana Makani subdivision are to be metered, recap-

---

2. DHHL and OHA filed joint exceptions to the Commission's "Proposed Findings Of Fact, Conclusions Of Law, And Decision And Order[.]"

3. It appears that Caparida and Kuahuia refiled the same motion on October 18, 2001.

4. The particulars will be set forth as they become relevant in the forthcoming discussion.

tured, and used for irrigation of the golf course or for other outdoor uses. A flow meter, approved by the Chairperson, shall be installed to measure the back wash water used to clean the filters. The flow meter shall be operational within 90 days of the issuance of the aforementioned permits. Meter readings are to be taken monthly and made available to the Commission upon request. If and when the back-washing system is no longer needed, that amount of water may be used to blend with non-potable alternative sources for the resort's other non-potable applications and uses.

3 Meters are to be installed within 90 days of the issuance of the aforementioned permits (a) to measure the amount of non-potable sewage effluent going into the golf course irrigation lake; and (b) to measure the amount of non-potable water withdrawn from the golf course irrigation lake for irrigation of Holes 2 through 6 of the golf course. Meter readings are to be taken monthly and made available to the Commission at their request.

4 Within six-months of the date of issuance of the aforementioned permits, KMI will prepare and present to the Commission a report on the affirmative steps it is taking to control leakage and evaporation from the KMI water system. This report need not include leakage or evaporative losses incurred as KMI's permitted water passes through the Molokai Irrigation System.

5 Within twenty-four months of the date of issuance of the aforementioned permits, KMI will prepare and present to the Commission a feasibility study on the development of a new source of nonpotable water near Mahana which can be blended to irrigate the golf course.

6 Through xeriscaping, low-flow fixtures, water-blending, and other similar practices, Kukui (Moloka'i), Inc., or its suc-

cessors or assigns, will make every reasonable effort to encourage and practice the conservation of potable and non-potable water at its hotel and resort condominium operations lots and at private residences that are users of water pumped from Well # 17. KMI will submit a written report to the Commission, within six months of the date of issuance of the aforementioned permits, on the progress of compliance with the terms of this condition.

7 KMI will prepare and distribute a memorandum to all lot and condominium owners notifying them of the need to practice conservation of potable and non-potable waters. A copy of the memorandum shall be sent to the Commission.

8 If and when KMI is able to establish its own potable water delivery system from Well 17 to the Kaluakoi Hotel, resort condominiums, and residential lots, the amounts permitted as "MIS System User Charges" ... will be rescinded.

DHHL filed a notice of appeal on January 17, 2002. OHA filed a notice of appeal on January 18, 2002. Caparida and Kuahuia filed a notice of appeal on January 18, 2002.[5]

## II. STANDARD OF REVIEW

### A. Administrative Decisions

HRS § 174C–12 (1993) provides: "Judicial review of rules and orders of the commission under this chapter shall be governed by [HRS] chapter 91 [of the Hawai'i Administrative Procedures Act, or HAPA]. Trial de novo is not allowed on review of commission actions under this chapter."

 Regarding appeals from agency decisions generally,

HRS § 91–14(g) (1993) enumerates the standards of review applicable to an agency appeal and provides:

Upon review of the record the court may affirm the decision of the agency or re-

5. On February 21, 2002, while the appeal was pending, Kaluakoi Land, LLC filed a "Motion For Substitution Of Parties[.]" Therein, Kalua-

koi Land, LLC explained that it acquired the assets of KMI.

mand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional and statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

GATRI v. Blane, 88 Hawai'i 108, 112, 962 P.2d 367, 371 (1998) (citing Poe v. Hawai'i Labor Relations Bd., 87 Hawai'i 191, 194–95, 953 P.2d 569, 572–73 (1998)).

[FOFs] are reviewable under the clearly erroneous standard to determine if the agency decision was clearly erroneous in view of reliable, probative, and substantial evidence on the whole record. Alvarez v. Liberty House, Inc., 85 Hawai'i 275, 277, 942 P.2d 539, 541 (1997); HRS § 91–14(g)(5).

[COLs] are freely reviewable to determine if the agency's decision was in violation of constitutional or statutory provisions, in excess of statutory authority or jurisdiction of agency, or affected by other error of law. Hardin v. Akiba, 84 Hawai'i 305, 310, 933 P.2d 1339, 1344 (1997) (citations omitted); HRS §§ 91–14(g)(1), (2), and (4).

"A COL that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the conclusion is dependent upon the facts and circumstances of the particular case." Price v. Zoning Bd. of Appeals of City and County of Honolulu, 77 Hawai'i 168, 172, 883 P.2d 629, 633 (1994). When mixed questions of law and fact are presented, an appellate court must give deference to the agency's expertise and experience in the particular field. Dole Hawaii Division–

Castle & Cooke, Inc. v. Ramil, 71 Haw. 419, 424, 794 P.2d 1115, 1118 (1990). "[T]he court should not substitute is own judgment for that of the agency." Id. (citing Camara v. Agsalud, 67 Haw. 212, 216, 685 P.2d 794, 797 (1984)).

Poe, 87 Hawai'i at 197, 953 P.2d at 573

In re Water Use Permit Applications, 94 Hawai'i 97, 119, 9 P.3d 409, 431 (2000) ("Waiahole I") (quoting Curtis v. Board of Appeals, 90 Hawai'i 384, 392–93, 978 P.2d 822, 830–31 (1999)).

An FOF or mixed determination of law and fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding or determination, or (2) despite substantial evidence to support the finding or determination, the appellate court is left with the definite and firm conviction that a mistake has been made. See Leslie v. Estate of Tavares, 91 Hawai'i 394, 399, 984 P.2d 1220, 1225 (1999). "We have defined 'substantial evidence' as credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." Id. (quoting State v. Kotis, 91 Hawai'i 319, 328, 984 P.2d 78, 87 (1999)). Id.

## B. Statutory Interpretation

■■■■ In construing statutory language, this court has adhered to the following framework:

First, the fundamental starting point for statutory interpretation is the language of the statute itself. Second, where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning. Third, implicit in the task of statutory construction is our foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. Fourth, when there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists. And fifth, in construing an ambiguous statute, the meaning of the ambiguous words may be sought by examining the context, with which the ambigu-

ous words, phrases, and sentences may be compared, in order to ascertain their true meaning.

*Awakuni v. Awana,* 115 Hawai'i 126, 133, 165 P.3d 1027, 1034 (2007) (citation omitted).

## III. DISCUSSION

It is now well established that the public trust doctrine is a "fundamental principle of constitutional law in Hawai'i," *Waiahole I,* 94 Hawai'i at 131–32, 9 P.3d at 443–44, and that its principles permeate the State Water Code. *See id.* at 130, 9 P.3d at 442 ("[T]he legislature appears to have engrafted the doctrine wholesale in the [State Water] Code."); *see also In re Wai'ola O Moloka'i, Inc.,* 103 Hawai'i 401, 429, 83 P.3d 664, 692 (2004) ("[T]his court traced the historical development of the public trust doctrine in Hawai'i and reasoned therefrom that article XI, sections 1 and 7 of the Hawai'i Constitution ... adopted 'the public trust doctrine as a fundamental principle of constitutional law in Hawai'i' and that the legislature, pursuant to the constitutional mandate of article XI, section 7, incorporated public trust principles into the [Water] Code." (Citing *Waiahole I,* 94 Hawai'i at 130–32, 9 P.3d at 443–45.)).

▆▆▆ We have recently explained the basic precepts of the state water resources trust as follows:

"Under the public trust [doctrine] and the Code, permit applicants have the burden of justifying their proposed uses in light of protected public rights in the resource." *Waiahole I,* 94 Hawai'i at 160, 9 P.3d at 472. The Water Code requires, *inter alia,* that the applicant prove that the proposed use of water is a "reasonable-beneficial use" and is "consistent with public interest." HRS §§ 174C–49(a)(2) and (4) (1993). "Reasonable-beneficial use" is defined as "the use of water in such a quantity as is *necessary* for economic and efficient utilization, for a purpose, and in a manner which is both reasonable and consistent with the state and county land use plans and public interest." HRS § 174C–3 (1993) (emphasis added).

Furthermore, besides advocating the social and economic utility of their proposed uses, permit applicants must also *demon-strate the absence of practicable mitigating measures, including the use of alternative water sources.* Such a requirement is intrinsic to the public trust, the statutory instream use protection scheme, and the definition of 'reasonable-beneficial' use, and is an essential part of any balancing between competing interests.

*Waiahole I,* 94 Hawai'i at 161, 9 P.3d at 473 (citation omitted) (emphasis added). In addition, "applicants must still demonstrate their actual needs and, within the constraints of available knowledge, the propriety of draining water from public streams to satisfy those needs." *Id.* at 162, 9 P.3d at 474.

The Water Commission, on the other hand, is duty-bound to place the burden on the applicant to justify the proposed water use in light of the trust purposes and "weigh competing public and private water uses on a case-by-case basis[,]" requiring a higher level of scrutiny for private commercial water usage. *Id.* at 142, 9 P.3d at 454. Moreover, as discussed *supra* in section III.A.1., the Water Commission's findings must reasonably explain and justify its conclusions and rulings. *Id.* at 157–58, 9 P.3d at 469–70. Finally,

the Commission must not relegate itself to the role of a mere "umpire passively calling balls and strikes for adversaries appearing before it," but instead must take the initiative in considering, protecting, and advancing public rights in the resource at every stage of the planning and decisionmaking process.... Specifically, the public trust compels the state duly to consider the cumulative impact of existing and proposed diversions on trust purposes and to implement reasonable measures to mitigate this impact, including using alternative resources.... *In sum, the state may compromise public rights in the resource pursuant only to a decision made with a level of openness, diligence, and foresight commensurate with the high priority these rights command under the laws of our state.*

*Id.* at 143, 9 P.3d at 455 (citations omitted) (emphasis added). In light of the forego-

ing, this court must take a "close look" at the Water Commission's action to determine if it complies with the Water Code and the public trust doctrine.

*In re Water Use Permit Applications,* 105 Hawai'i 1, 15–16, 93 P.3d 643, 657–58 (2004) ("*Waiahole II* ").

Although expressed in terms of the diversion of water from public streams, this court has stated that the doctrine "applies to all water resources without exception or distinction[,]" *Waiahole I,* 94 Hawai'i at 133, 9 P.3d at 445, and "unlimited by any surface-ground distinction." *Id.* at 135, 9 P.3d at 447. With these general principles in mind, we turn to the arguments presented on appeal.

## A. DHHL's Points Of Error

1. *DHHL's reservation is a public trust "purpose" and not an "existing legal use."*

■ DHHL, OHA, and Caparida and Kuahuia each assert that DHHL's 2.905 mgd reservation is a distinct or existing "use" under the public trust. They thus challenge the Commission's conclusion of law ("COL") # 24, which states as follows:

24. DHHL, OHA, and Intervenors Judy Caprida [sic], Georgina Kuahuia, and Sarah Sykes ... have asserted that the water reservation in favor of DHHL in the Kualapu'u Aquifer is an existing legal use that is being interfered with by this proposed use. The Commission disagrees because a water reservation is not an existing legal use.

■ However, that issue has been conclusively resolved by this court's opinion in *Wai'ola,* filed during the pendency of the present appeal. Therein, we concluded that, "pursuant to the plain language of HRS § 174C–49(d) and HAR § 13–171–63, a 'reservation' of water does not constitute an 'existing legal *use* ' for purposes of HRS

§ 174C–49(a)(3)." *Wai'ola,* 103 Hawai'i at 427, 83 P.3d at 690 (emphasis added). Nevertheless, we held that DHHL's constitutional reservation of water resources "constitutes a public trust *purpose*[,]" *Wai'ola,* 103 Hawai'i at 430, 83 P.3d at 693 (emphasis added), "entitled to the full panoply of constitutional protections afforded the other public trust purposes enunciated by this court in *Waiahole*[ *I* ]." [6] *Id.* As such, the Commission was obligated to "take [DHHL's reservation] into account in the planning and allocation of water resources, and to protect [it] whenever feasible[,]" *id.* (citing *Waiahole I,* 94 Hawai'i at 141, 9 P.3d at 453 (quoting *Nat'l Audubon Soc'y v. Superior Court of Alpine County,* 33 Cal.3d 419, 189 Cal.Rptr. 346, 658 P.2d 709, 728 (Cal.1983), *cert. denied,* 464 U.S. 977, 104 S.Ct. 413, 78 L.Ed.2d 351 (1983))), insofar as its status as a public trust purpose rendered it "superior to[ ] the prevailing private interests in the resources at any given time." *Id.* at 429, 83 P.3d at 692 (citing *Waiahole I,* 94 Hawai'i at 138, 9 P.3d at 450). As previously mentioned, the public trust doctrine "effectively prescribes a 'higher level of scrutiny' for private commercial uses ... [and] that the burden ultimately lies with those seeking or approving such uses to justify them in light of the purposes protected by the trust." *Id.* (citing *Waiahole I,* 94 Hawai'i at 142, 9 P.3d at 454). That being said, the Commission is, by no means, categorically precluded from approving uses which may compromise DHHL's reservation, so long as the Commission's decision is "made with a level of openness, diligence, and foresight commensurate with the high priority these rights command under the laws of our state." *Id.* (citing *Waiahole I,* 94 Hawai'i at 143, 9 P.3d at 455); *see also Waiahole II,* 105 Hawai'i at 16, 93 P.3d at 658 (same); *Wai'ola,* 103 Hawai'i at 433, 83 P.3d at 696 ("Thus, to the extent that the Commission's decision compromised DHHL's existing wells in the Kualapu'u aquifer system, we believe that the Commission

---

6. In *Waiahole I,* this court identified the following three public trust purposes:

(1) water resource protection, which includes "the maintenance of waters in their natural state" as "a distinct use" and "disposes of any portrayal of retention of waters in their natural state as 'waste' "; (2) domestic use protection,

particularly drinking water; and (3) the exercise of native Hawaiian and traditional and customary rights.

*Wai'ola,* 103 Hawai'i at 429, 83 P.3d at 692 (citing *Waiahole I,* 94 Hawai'i at 136–38, 9 P.3d at 448–50).

did so 'with a level of openness, diligence, and foresight commensurate with the high priority these rights command under the laws of our state.'" (Citation omitted.)).[7]

2. *The Commission failed to adequately scrutinize KMI's request to divert water.*

DHHL's second point of error contends that the Commission failed to apply even minimal scrutiny to KMI's request to divert water from the Kualapu'u Aquifer for private commercial use. This is an apparent reference to this court's previous admonition in *Waiahole I*, that "[u]nder no circumstances . . . do the constitution or the Code allow the Commission to grant permit applications with minimal scrutiny." 94 Hawai'i at 160, 9 P.3d at 472. For the following reasons, we agree with DHHL that the Commission's decision lacked the requisite degree of scrutiny.

a. **The sustainable yield**

■ Specifically, DHHL argues that the Commission failed to apply the requisite level of scrutiny insofar as it relied on the 5.0 mgd sustainable yield determination in spite of evidence that the Kualapu'u Aquifer may be overdrawn and that the sustainable yield may actually be as low as 3.2 mgd. The Commission counters that the 5.0 mgd sustainable yield is statutorily deemed to be the appropriate planning guideline when balancing such competing interests. Utilization of the sustainable yield, the Commission claims, is neither "rigid" nor "inflexible" to the extent that any uncertainty as to the accuracy of the sustainable yield is adequately addressed by the fact that any party may petition for, or the Commission may on its own order, a hearing to show cause as to why the permitted amounts of water should not be reduced. KMI also argues that the sustainable yield is the appropriate guidepost when allocating water from the Kualapu'u Aquifer.

KMI points out that the sustainable yield was set by rulemaking procedure, and that any challenge to the accuracy of the sustainable yield must be made via a petition to amend or modify the sustainable yield pursuant to HRS § 174C–31(p). We agree with the Commission and KMI that the Commission did not err by relying on the sustainable yield determination.

The Commission is mandated by the Code to determine a sustainable yield for each hydrological unit within the state. *See* HRS § 174C–31(f)(2) (1993). The term, "sustainable yield," is defined by the Code as "the maximum rate at which water may be withdrawn from a water source without impairing the utility or quality of the water source as determined by the commission." HRS § 174C–4 (1993). The Commission is instructed to calculate the sustainable yield "using the best information available." HRS § 174C–31(f)(2). At the time of KMI's application, the sustainable yield for the Kualapu'u Aquifer was determined to be 5.0 mgd.

As the Commission and KMI suggest, the Code precludes the ad hoc revision of the sustainable yield. The sustainable yield figures are critical components of the state water plan, *see generally* HRS § 174C–31, and may not be modified absent notice and a public hearing. *See* HRS § 174C–31(m) (1993) ("The commission shall not adopt, approve, or modify any portion of the Hawaii water plan which affects a county or any portion thereof without first holding a public hearing on the matter on the island on which the water resources are located. At least ninety days in advance of such hearing, the commission shall notify the affected county and shall give notice of such hearing by publication within the affected region and statewide."). Moreover, in *Waiahole I*, this court has impliedly endorsed reference to sustainable yield determinations in the context of ground water permit applications:

[the Hawai'ian Homes Commission Act] § 220, HRS § 174C–49(a)(7), and HRS § 174C–101(a) comprise the state law equivalent to the *Winters* doctrine for purposes of homesteaders on Hawaiian homelands. Thus, the *Winters* doctrine is inapplicable to the present matter." 103 Hawai'i at 428 n. 28, 83 P.3d at 691 n. 28.

7. We also note that OHA additionally asserts that DHHL's water reservation rights are grounded in the "federal-reserved-water-rights" doctrine pronounced in the United States Supreme Court's decision in *Winters v. United States*, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908). In *Wai'ola*, however, this court rejected that precise argument, stating that "the 1991 amendments to

Early designation of instream flow standards furthers several important objectives. First, it fulfills the Commission's duty of protection under constitution and statute, ensuring that instream uses do not suffer inadvertent and needless impairment. It also preserves the integrity of the Commission's comprehensive planning function. *If the Commission decides instream flow standards and permit applications at the same time, private interests in offstream use will have already become "highly particularized," risking an ad hoc planning process driven by immediate demands.* See [Douglas W. MacDougal, *Private Hopes and Public Values in the "Reasonable Beneficial Use" of Hawai'i's Water: Is Balance Possible?*, 18 U. Haw. L.Rev. 1, 66 & n. 302 (1996) ] (citing *United States v. State Water Resources Control Bd.*, 182 Cal.App.3d 82, 227 Cal.Rptr. 161, 180 (1986)). Finally, initial designation of instream flow standards relieves the Commission, as well as existing and potential offstream users, of the complexity and uncertainty presented by the unsettled question of instream flow requirements. *See id.* [at] 58–59, 66. Once the Commission translates the public interest in instream flows into "a certain and manageable quantity [, t]he reference to consistency with the public interest in the definition of reasonable beneficial use likewise becomes a reference to that quantity." *Id.* at 62.

94 Hawai'i at 148–49, 9 P.3d at 460–61 (emphasis added) (some brackets added and some in original). Although the foregoing excerpt expressly refers to surface water instream flow standards, this court has analogized ground water sustainable yield determinations to instream flow standards. *See id.* at 148, 9 P.3d at 460 ("These provisions confirm what the Commission recognized in its decision, that the Code contemplates the instream flow standard as the surface water corollary to the ground water sustainable yield." (Quotation marks omitted.)).

Hence, contrary to DHHL's assertions, it would be inappropriate for the Commission to reevaluate the sustainable yield figure in a permit application proceeding.

### b. DHHL's application to withdraw water

DHHL additionally asserts that the Commission's approval of KMI's request to divert water cannot be reconciled with the Commission's refusal to grant DHHL's request for water on the grounds that there were "very real concerns" over sustaining the "potable quality" of the wells located in the Kualapu'u Aquifer. Although the Commission does not address this point, KMI asserts that the Commission staff's recommendation to reject DHHL's application for additional pumpage was based upon the fact that increased pumpage in the two existing DHHL wells would increase chloride content in not only DHHL's wells, but also the County Department of Water Supply's ("DWS") wells. The Commission's staff recommended that increased withdrawals come from new wells located elsewhere in the aquifer. KMI now accuses DHHL of seeking to have KMI's preexisting uses reduced so that DHHL can obtain permits for new uses of water without incurring the expenses of creating new wells in the Kualapu'u Aquifer. For the following reasons, DHHL's argument is without merit.

The Commission explained its treatment of DHHL's application in its findings of fact, summarized as follows. DHHL controls 25,-383 acres of land on Moloka'i reserved for Hawaiian homesteaders and services these areas with water drawn from two wells located at a single site overlying the Kualapu'u Aquifer. DHHL previously obtained a permit to withdraw .367 mgd to serve its Hoolehua and Kalamaula homestead areas. On September 13, 1996, DHHL filed an application to increase its pumpage to 1.247 mgd. The Commission staff recommended the denial of DHHL's application on the grounds that the geographic concentration of the DHHL, DWS, and KMI wells "militated against granting a permit for the requested new withdrawals of .879 mgd from the existing DHHL wells...." The staff suggested that "such new withdrawals from the Kualapuu aquifer should be from new wells strategically located elsewhere within the aquifer so as not to interfere with the water quality in the existing wells." Specifically, the staff submittal cautioned that

[the] two DHHL wells (Well nos. 0801–01 & 02), the County Department of Water Supply (DWS) well (Well no. 0801–03), and the Kukui Molokai Well 17 (Well no. 0901–01) all reside within one-half mile of each other. In terms of a regional scale, these wells are concentrating pumpage in one spot in the aquifer system.... Chloride levels in the two DHHL wells and the DWS well are sensitive to pumping rates.... Early low chloride readings from these wells were around 60 mg/l during the 1980's but have risen above 100 mg/l during more recent years of the 1990's. On occasion, chloride levels have reached 180 mg/l. The EPA potability guideline for chloride is to 250 mg/l. Therefore, the increases in chloride levels in response to relatively small increases in pumpage from this well field is an indication that localized upconing and interference between these wells is occurring.

At a January 28, 1998 public hearing, DHHL proposed reducing its request to .21 mgd, to be taken from its 2.905 mgd reservation. The Commission requested that DHHL arrange for the United States Geological Survey ("USGS") to determine whether an approximate .2 mgd increase in pumpage would cause chloride levels in the well field to rise to "unacceptable levels." DHHL thereafter informed the Commission that the USGS was not able to answer that question, inasmuch as the USGS hydrological model was designed to simulate regional drawdowns and could not predict local scale upconing and drawdowns in the immediate vicinity of a particular well. The Commission also found that chloride increases in one of the DHHL wells was "in large part attributable to the commencement of pumping in the [DWS well] in 1991, which raised the level of withdrawal from 0.367 to 0.867 mgd in the immediate area." DHHL asserts that its application now "languishes unapproved" due to the Commission staff's recommended denial of its application.[8]

■ Obviously, the Commission was concerned with the effect of *increased pumpage* on the chloride content in the well field. Hence, inasmuch as KMI's application to continue an existing use did not threaten to increase pumpage, the Commission could reasonably have granted KMI's request for existing uses and denied DHHL's request for new uses. Moreover, the Commission correctly recognized that the Code contemplates a preference for existing uses.[9] *See* HRS § 174C–49(a)(3) (1993) ("To obtain a permit pursuant to this part, the applicant shall establish that the proposed use of water ... *[w]ill not interfere with any existing legal use of water* ...." (Emphasis added.)); *Waiahole I*, 94 Hawai'i at 165 n. 67, 9 P.3d at 478 n. 67 ("[T]he Code gives 'existing' legal uses priority over 'new' uses in the permitting process."); *Ko'olau Agric. Co., Ltd. v. Comm'n of Water Res. Mgmt.*, 83 Hawai'i 484, 492, 927 P.2d 1367, 1375 (1996) ("Existing uses are given preferences under the Code...."). In accordance with that preference, the Commission declined to uproot a preexisting use in favor of a new use. Therefore, the Commission's decision in that regard does not appear unreasonable, arbitrary, or capricious.

■ The same cannot be said, however, for the Commission's decision to permit KMI to withdraw 82,000 gd from the aquifer for "new" uses. As mentioned, the Commission's staff recommended that the Commission deny DHHL's request for new, public uses on the grounds that (1) the DHHL, DWS, and KMI wells "all reside within one-half mile of each other[,]" (2) the wells "are concentrating pumpage in one spot in the aquifer system[,]" and (3) "increases in chloride levels in response to relatively small increases in pumpage from this well field is an indication that localized upconing and interference between these wells is occurring." Inasmuch as KMI's well is, per the Commission's staff's own recommendation, contributing to the concentrated pumpage, we are compelled to wonder why the Commission

8. There is nothing in the record that indicates any further action on DHHL's application.

9. In its COL # 14, the Commission stated that "[s]ection 174C–50(i), HRS, states that an exist-

ing use shall be given priority over any other application provided that the use remains the same and is reasonable and beneficial and water is available."

did not similarly toll KMI's request for new uses. We do not suggest that the Commission did not have a valid reason for its conclusion or that the Commission was absolutely barred from reaching its result. Rather, the Commission has simply failed to explain the rationale behind the disparate treatment. Due to the apparent contradiction, we remand the issue for additional findings of fact and conclusions of law. "Clarity," we have said, "is all the more essential 'in a case such as this where the agency performs as a public trustee and is duty bound to demonstrate that it has properly exercised the discretion vested in it by the constitution and the statute.'" *Waiahole II,* 105 Hawai'i at 11, 93 P.3d at 653 (citing *Save Ourselves, Inc. v. Louisiana Envtl. Control Comm'n,* 452 So.2d 1152, 1159–60 (La.1984)). *See also Waiahole I,* 94 Hawai'i at 163, 9 P.3d at 475 ("A reviewing court must judge the propriety of agency action solely by the grounds invoked by the agency, and that basis must be set forth with such clarity as to be understandable." (Quoting *Louisiana–Pac. Corp., W. Div. v. NLRB,* 52 F.3d 255, 259 (9th Cir. 1995).) (Quotation marks omitted.)).

### c. The Commission failed to consider the feasibility of alternative sources of water.

■ DHHL further points out that the Commission failed to provide any indication that it considered the feasibility or practicability of alternative sources of water for KMI's requested uses.[10] The record confirms DHHL's allegation, and that omission requires us to vacate KMI's permits.

This court has, on multiple occasions, expounded on the necessity of considering alternative sources of water in balancing the distribution of a scarce public trust resource.

In *Waiahole I,* the Estate of James Campbell ("Campbell Estate") was among various applicants before the Commission requesting diversion of water from the Waiahole Ditch. 94 Hawai'i at 164, 9 P.3d at 476. The record indicated that Campbell Estate already possessed permits to pump 35 mgd of ground water from beneath its lands to support its agricultural purposes, but lacked proper pumping mechanisms. *Id.* The record also contained testimony that "it would require millions of dollars to put infrastructure in place to pump water from the Pearl Harbor aquifer wells to the Campbell Estate fields which currently use Waiahole Ditch water." *Id.* at 164–65, 9 P.3d at 476–77. The Commission expressed findings recognizing Campbell Estate's permits. *Id.* at 165, 9 P.3d at 477. The Commission also made "various general findings on the effects of irrigation on leeward aquifers, the costs of developing other alternative sources, and future growth in water demand." *Id.* The Commission ultimately decided to conditionally approve the leeward agricultural uses "[i]f and until treated effluent or ground water is available[.]" *Id.* This court found the Commission's decision to be unacceptable insofar as the Commission's findings failed to "answer, with any reasonable degree of clarity, why it is not practicable for Campbell Estate to use ground water permitted to it and not otherwise in use as an alternative to diverting the sole source of water for windward streams, especially given the still unsettled state of instream flow standards." *Id.* Accordingly, we vacated Campbell Estate's permit and remanded the matter for further proceedings. *Id.*

On remand, the Commission determined that Campbell Estate had no practicable alternatives and issued Campbell Estate a water use permit for 4.74 mgd. *Waiahole II,* 105 Hawai'i at 16, 93 P.3d at 658. On appeal before this court in *Waiahole II,* appellants argued that Campbell Estate failed to meet its burden of establishing that no practicable alternative sources of water existed. *Id.* This court again found the Commission's analysis deficient:

> In the instant case, the Water Commission entered no FOFs or COLs as to whether Campbell Estate met its burden. Instead, the Water Commission found, based on the testimony of Bert Hatton (Hatton), a Campbell Estate witness, that "until the Supreme Court issued its decision in August 2000, Campbell Estate was assured of Waiahole Ditch water, so they did not con-

---

10. Neither the Commission nor KMI respond to this argument in their appellate briefs.

duct a systematic study of alternative water sources. During the past 6 months, there have been some informal and very general discussions about possible scenarios if Ditch water were no longer available." D & O II at 93. "Informal" and "very general discussions" are insufficient to satisfy Campbell Estate's burden. *Id.* We subsequently opined that "[t]he Water Commission's analysis should have ceased when Campbell Estate failed to meet its burden of establishing that no practicable alternative water sources existed." *Id.* We thus concluded that, "inasmuch as the Water Commission entered no FOFs or COLs as to whether Campbell Estate satisfied its burden of establishing that no practicable alternatives existed, we remand the matter for further proceedings relating thereto." *Id.* at 17, 93 P.3d at 659.

Here, the Commission entered no FOFs or COLs as to the existence or feasibility of any alternative sources of water whatsoever. The Commission has thus failed to hold KMI to its burden of demonstrating the absence of feasible alternative sources of water. *See Waiahole I,* 94 Hawai'i at 161–62, 9 P.3d at 473–74 ("Furthermore, besides advocating the social and economic utility of their proposed uses, permit applicants must also demonstrate the absence of practicable mitigating measures, including the use of alternative water sources."). "Such a requirement is intrinsic to the public trust, the statutory instream use protection scheme, and the definition of 'reasonable-beneficial' use, ... and is an essential part of any balancing between competing interests...." *Id.* (footnote and citations omitted).

Indeed, the Commission appears to have reserved consideration of feasible alternative sources of water until after the permit has been granted. In its decision and order, the Commission included, as a condition to the granting of KMI's permits, the following contingency: "Within twenty-four months of the date of issuance of the aforementioned permits, KMI will prepare and present to the Commission a feasibility study on the development of a new source of nonpotable water near Mahana which can be blended to irrigate the golf course." Such a practice is fundamentally at odds with the Commission's public trust duties. The feasibility of a new source of nonpotable water (*i.e.,* an alternative source of water) should have been considered prior to the granting of KMI's permit, not after the fact. The Commission cannot fairly balance competing interests in a scarce public trust resource if it renders its decision prior to evaluating the availability of alternative sources of water. Thus, KMI's failure to demonstrate the absence of practicable alternatives should have terminated the inquiry. *See, e.g., Waiahole II,* 105 Hawai'i at 16, 93 P.3d at 658 ("The Water Commission's analysis should have ceased when [the applicant] failed to meet its burden of establishing that no practicable alternative water sources existed.").

For the foregoing reasons, we conclude that the Commission has failed in its public trust duty to hold KMI to its burden of demonstrating the absence of other practicable alternatives. The Commission has thereby failed to establish an adequate basis for the amount of water allocated to KMI.

### d. The Safe Water Drinking Act

DHHL avers that the Commission rejected, without explanation, uncontroverted evidence that KMI was in violation of the Safe Drinking Water Act ("SDWA"), codified as HRS chapter 340E.

KMI initially responded that DHHL waived the argument inasmuch as the SDWA was not raised when the Commission and the parties determined the issues for the proceedings below. However, KMI only refers this court to a minute order in the record stating that the parties were limited to the following matters:

1. Do the existing and proposed uses of water meet the criteria for the issuance of a water use permit as provided in Haw. Rev.Stat. §§ 174C–49(a) and 174C–50(b)?

2. Are the existing and proposed uses reasonable-beneficial uses as defined in Haw.Rev.Stat. § 174C–3, and allowable under the common law of the State?

. . . .

3. Are the existing and proposed uses consistent with the public interest, includ-

ing but not limited to, the statement of policy objectives declared to be in the public interest as set forth in Haw.Rev.Stat. § 174C–2(c). Without limiting any other factual public interest issues that the parties deem relevant at the time, the parties shall address the quantified effect, if any, of the well pumping of ground water on stream flow and nearshore ocean resources.

4. Are the existing and proposed uses allowable under the common law of the State. Without limiting any other relevant factual issues that could be present hereunder, the parties shall address whether any party has any appurtenant or riparian right under Haw.Rev.Stat. § 174C–101, or any other right to water that is equal to or has priority over the existing and proposed uses of water by Applicants. The parties shall quantify the amount of water they are claiming.

5. In the event the above-referenced water use application is not denied, the conditions, if any, that should be imposed on the Applicants' water permit for the existing and proposed water uses.

To the extent that DHHL argues that violations of the SDWA are relevant to the question whether the requested existing and proposed uses are reasonable-beneficial, *see* discussion *infra*, the SDWA violations are fairly subsumed within the second issue expressed by the Commission above, and the argument has not been waived.

KMI additionally asserts that any violations of the SDWA were irrelevant insofar as (1) full compliance with the SDWA is not a prerequisite to obtaining a water use permit under the Code, (2) the specific violation referred to by DHHL is with respect to the treatment facility and does not compromise the quality of water produced by that treatment facility, and (3) factual evidence of compliance with state and federal regulations was presented before the Commission. The record indicates that the Department of Health ("DOH") filed a "Notice and Finding of Violation" against KMI, dated August 18, 1993. The DOH found, in relevant part, that "[KMI] ha[d] been using the Kaluakoi water system to supply water to the public,

after June 29, 1993, without filtration that meets the criteria of HAR § 11–20–46(c) or the Surface Water Treatment Rule ("SWTR") Administrative Manual, as required by HAR § 11–20–46(a)(4)." DHHL submitted proposed findings of fact describing the foregoing violation, but the Commission, in its Decision and Order, rejected them without explanation.

Despite evidence in the record that KMI failed to comply with the SDWA, we hold that neither the Code nor the public trust preclude the Commission from allocating water to KMI for the purpose of supplying water to domestic end users from a delivery system that may not comply with the provisions of the SDWA. It is clear that this jurisdiction separately regulates water allocation, *see* HRS chapter 174C, and drinking water standards, *see* HRS chapter 340E. The Code and the SDWA do not reference each other, and we can discern no legislative intent to make water use permit applications subject to compliance with the SDWA. *See Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 964 (9th Cir.2006) (rejecting the argument that granting a permit to mine gold violated the water quality provisions of Nevada's Clean Water Act, in pertinent part, because "Nevada does not regulate water withdrawal in the same [statutory] regime as water quality...."). Although DHHL asserts that the distribution of potentially unsafe water to domestic users is neither reasonable, beneficial, nor in the public interest, the public interest is adequately protected by the enforcement provisions of HRS chapter 340E. *See* HRS § 340E–8 (Supp.1995) (authorizing civil and criminal penalties). Violations of the SDWA are simply not germane to a review of the propriety of water allocations under the Code and the public trust.

3. *The Commission appears to have placed the burden of proof on DHHL to demonstrate that pumpage at KMI's well would increase the chloride concentration at the DHHL well site.*

DHHL also asserts that the Commission erred by placing the burden of proof on DHHL to produce conclusive evidence of harm to public trust resources. DHHL spe-

cifically challenges the Commission's COL # 51, which states as follows:

> Finally, DHHL asserts that continuing the existing and permitting the proposed uses would make it impossible for DHHL to utilize its full allocation in Kualapuu by increasing the chloride concentration levels. *There was no conclusive evidence presented that the proposed pumpage in Well 17 alone would increase the chloride concentration to unacceptable levels at the DHHL wells.*

(Emphasis added.) DHHL also continues to assert that the Commission has, by granting KMI existing and proposed uses, precluded DHHL from making full use of its reservation. DHHL claims that the Commission

> allowed powerful private interests to complete their rush-to-monopolize Kualapu'u water before DHHL could utilize its own reservation. And, with cruel irony, at the same time it was allowing KMI to export water for its distant golf course in the desert, the Commission staff recommended denial of DHHL's request to use its reserved water within the boundaries of the aquifer on concerns over the vitality of Kualapu'u.

(Emphases omitted.)

The Commission, on the other hand, argues that it correctly required KMI to justify its existing and proposed uses. With respect to KMI's existing uses, the Commission refers this court to its COL # 15, which states as follows: "Based on the evidence presented, the Commission concludes that accountable existing uses of water from Well 17 remain the same and the allocation herein is reasonable and beneficial and allowable under the common law." As to KMI's proposed uses, the Commission refers to its COLs Nos. 16, 17 and 18:

16. Section 174C–49(a), HRS, places the burden on an applicant to establish that the proposed water uses meet all the following seven criteria:

a. Can be accommodated with the available water source;

b. Is a reasonable-beneficial use as defined in section 174C–3;

c. Will not interfere with any existing legal use of water;

d. Is consistent with the public interest;

e. Is consistent with state and county general plans and land use designations;

f. Is consistent with county land use plans and policies; and

g. Will not interfere with the rights of the department of Hawaiian home lands as provided in section 221 of the Hawaiian Homes Commission Act.

17. The applicant's burden of proof is by a preponderance of the evidence. Section 91–10(5), HRS.

18. Based on the evidence presented, the Commission concludes, for the reasons set forth below, that the water use permit application for proposed uses, as amended by this decision and order, meets all the conditions in sections 14C–49(a), HRS, by a preponderance of the evidence.

KMI additionally contends that the evidence in the record suggests that increased chloride concentration in the DHHL wells was caused by pumpage in the nearby DWS well, and that the impact of pumpage in KMI's well on the DHHL wells was unknown:

> In this case, the two existing DHHL wells, the DWS well, and Applicant's well are all within one-half mile of each other. . . . . Based thereon, it was found that an upconing effect resulted as well pumpage was concentrated around the two DHHL wells and the DWS well and that chloride levels in these wells were sensitive to pumpage rates. No finding was made that Well 17 was similarly affected by increased well pumpage.

We agree with DHHL that the Commission's COL # 51 is cause for concern. Although the Commission found that the increase in chloride concentration at the DHHL well site is, in large part, caused by pumpage in the nearby DWS well, it is undisputed that KMI's well is also in close proximity to the DHHL and DWS wells and its impact on the DHHL wells is unknown. Un-

der these circumstances, rejecting DHHL's argument by simply stating that "[t]here was no conclusive evidence presented that the proposed pumpage in Well 17 alone would increase the chloride concentration to unacceptable levels at the DHHL wells," gives the impression that the Commission improperly placed the burden of proof on DHHL.

We do, however, recognize the Commission's predicament when inconclusive allegations raise a specter of harm that cannot be dispatched by readily available evidence. We note that in such situations, the public trust doctrine does not handcuff the Commission. Under the Code and the public trust, it is the applicant's burden to demonstrate that the use requested is "reasonable-beneficial," meaning "the use of water in such quantity as is necessary for economic and efficient utilization, for a purpose, and in a manner which is both reasonable and consistent with the state and county land use plans and the public interest." HRS § 174C–3. Hence, to the extent that harm to a public trust purpose (*i.e.*, the DHHL's reservation) is alleged, the permit applicant must demonstrate that there is, in fact, no harm, or that any potential harm does not rise to a level that would preclude a finding that the requested use is nevertheless reasonable-beneficial. To that end, although the present matter involves an allegation of harm that is not readily ascertainable, the Commission may nevertheless permit existing and proposed diversions of water if KMI can demonstrate that such diversions are reasonable-beneficial notwithstanding the potential increase in chloride concentration at the DHHL well site.

It may well be that the Commission believed that KMI's existing and proposed uses were reasonable-beneficial in spite of the potential increase in chloride concentration at the DHHL wells, but the Commission did not say as much and merely responded to DHHL's concerns by pointing to a lack of "conclusive evidence." Therefore, we hold that the Commission should be given the opportunity to clarify COL # 51 on remand.

4. *The Commission's decision did not violate the precautionary principle.*

DHHL next asserts that the Commission violated the precautionary principle described by this court in *Waiahole I.* DHHL argues that the Commission's decision to grant KMI's permit and reserve jurisdiction to amend it in the event of unexpected and significant adverse impacts on DHHL's wells "flies in the face" of the foregoing principle. DHHL highlights the following special condition imposed by the Commission's Decision and Order:

C. Because the sustainable yield of the Kualapu'u Aquifer system is close to full allocation, the issuance of both permits is subject to the following special conditions:

1. If there are significant or unexpected increases in chlorides or drawdowns in the two DHHL wells, the DWS well, or KMI's Well 17, substantially in excess of what they were on the effective date of designation, any party may petition the Commission, or the Commission may on its own motion, order a show cause hearing as to why the permitted amounts of withdrawal of water should no be reduced along with lawful and equitable reductions in pumpage from other wells in the Kualapu'u Aquifer.

In *Waiahole I*, this court endorsed the Commission's application of precautionary principles in recognition of the lack of scientific certainty in the allocation of instream flows. The Commission stated that, "where there are present or potential threats of serious damage, lack of full scientific certainty should not be a basis for postponing effective measures to prevent environmental degradation." 94 Hawai'i at 154, 9 P.3d at 466. We agreed with the Commission, confirming that, "at minimum, the absence of firm scientific proof should not tie the Commission's hands in adopting reasonable measures designed to further the public interest." *Id.* at 155, 9 P.3d at 467.

Here, the scientific uncertainty raised by DHHL is whether the 5.0 mgd sustainable yield calculation for the Kualapu'u Aquifer is accurate. However, as previously men-

tioned, a permit application proceeding is an inappropriate forum for reevaluating the sustainable yield calculation.[11] Hence, it would be inappropriate for this court, in an appeal of a permit application proceeding, to nullify a sustainable yield calculation.

*Waiahole I,* as applied to the case at bar, instructs the Commission to faithfully apply the sustainable yield determination. 94 Hawai'i at 148–49, 9 P.3d at 460–61. Having done so, the Commission did not simply ignore DHHL's concerns that the sustainable yield figure does not account for localized upconing and drawdown effects. Rather, the Commission further reserved jurisdiction to modify KMI's permits in the event of "significant or unexpected increases in chlorides or drawdowns in the two DHHL wells, the DWS well, or KMI's Well 17, substantially in excess of what they were on the effective date of designation." Under the circumstances presented, the Commission's methodology constitutes a faithful application of the sustainable yield figure and includes reasonable precautionary measures. We have said that

> the Commission may make reasonable precautionary presumptions or allowances in the public interest. The Commission may still act when public benefits and risks are not capable of exact quantification. At all times, however, the Commission should not hide behind scientific uncertainty, but should confront it as systematically and judiciously as possible—considering every offstream use in view of the cumulative potential harm to instream uses and values and the need for meaningful studies of stream flow requirements.....
>
> As a practical matter, the Commission may decide that the foregoing balance supports postponing certain uses, or holding them to a higher standard of proof, pending more conclusive evidence of instream flow requirements. .... Even if it tentatively decides to allow certain offstream uses to proceed, the Commission may still subject the uses to permit conditions designed to protect the public interest. *See*

HRS § 174C–31(j). *At the very least, the Commission should, as it did in this case, condition permits so as to confirm its constitutional and statutory authority to modify or revoke the permits should it later determine that present instream flows are inadequate.*

*Id.* at 159–60, 9 P.3d at 471–72 (emphasis added); *cf. Wai'ola,* 103 Hawai'i at 444, 83 P.3d at 707 ("[T]he Commission did not abuse its discretion in imposing a well monitoring system as a condition to granting MR–Wai'ola a water use permit in the present matter and utilizing the Kākalahale well for such purpose.").

5. *The Commission erred by considering an untimely application .*

■■■ DHHL next argues that the Commission violated HRS § 174C–50(c) by considering an untimely existing use application. HRS § 174C–50(c) provides as follows:

> An application for a permit to continue an existing use must be made within a period of one year from the effective date of designation [of the water management area]. Except for appurtenant rights, failure to apply within this period creates a presumption of abandonment of the use, and the user, if the user desires to revive the use, must apply for a permit under section 174C–51. If the Commission determines that there is just cause for the failure to file, it may allow a late filing. However, the Commission may not allow a late filing more than five years after the effective date of rules implementing this chapter.

DHHL contends that the Water Commission designated the island of Moloka'i as a water management area effective July 15, 1992, and that existing use permit applications were due by July 15, 1993. DHHL concludes that KMI's application, filed on December 15, 1993, could not be considered as an existing use application inasmuch as (1) the application was not a legitimate amendment to an earlier timely application, and (2) the untimely application could not be excused for just

---

11. DHHL may challenge the sustainable yield in an appropriate, independent proceeding, and the Commission's ruling may give rise to an appeal.

However, as it stands, that issue is not before this court.

cause because the just cause exception ceased to be available on May 27, 1993.[12]

KMI and the Commission do not contest DHHL's assertion that late filing was statutorily precluded after May 27, 1993. Rather, they contend that the December 15, 1993 application was an amendment to an earlier application filed by Moloka'i Ranch, Kaluakoi Moloka'i, and Moloka'i Irrigation System on June 8, 1993. A similar situation was presented in *Waiahole I*. Therein, the Commission granted Pu'u Makakilo, Inc. ("PMI") a .75 mgd water use permit. *Id.* at 165, 9 P.3d at 477. In doing so, the Commission treated PMI's requested uses as "new," rather than "existing," apparently because PMI's application to continue existing uses was not timely filed. *Id.* The Commission designated the windward aquifers as ground water management areas effective July 15, 1992. *Id.* at 166, 9 P.3d at 478. On June 3, 1993, Waiahole Irrigation Company ("WIC"), the former operator of the Waiahole ditch, filed a joint use permit application that did not mention PMI. *Id.* On June 14, 1994, WIC filed an amended joint use permit application that referred to PMI in attached exhibits but did not designate PMI as an applicant. *Id.* PMI was not named as an applicant until a subsequent amendment was filed on October 24, 1994. *Id.* None of the applications characterized PMI's requested uses as "existing." *Id.* Although PMI asserted that it did not acquire title to the property in question until November 21, 1994, and that the initial failure to identify PMI as an applicant was an "oversight," this court stated that "[those] exigencies [did] not compel the Commission to ignore the express statutory deadline for existing use permit applications." *Id.*

In the case at bar, the Commission should have strictly applied the statutory deadline for existing use permit applications as it did in *Waiahole I*. Here, Moloka'i was designated a water management area effective July 15, 1992. Pursuant to HRS § 174C–50(c),

existing use applications were due by July 15, 1993. On June 8, 1993, a timely application was filed requesting permission to withdraw ten percent of the total pumpage from Well # 17. The application identified Moloka'i Ranch as the landowner, and Kaluakoi Moloka'i and Moloka'i Irrigation System were identified as the applicants. KMI was not mentioned. KMI obtained title to the land overlying Well # 17 on October 19, 1993. KMI then submitted its own application on December 15, 1993. The application identified KMI as the landowner and sole applicant. We hold that these circumstances are sufficiently analogous to the facts presented in *Waiahole I*, such that *Waiahole I's* strict application of the statutory deadline controls. In *Waiahole I*, despite the fact that the timely filed application was eventually amended to incorporate PMI's requested uses, this court approved the Commission's conclusion that PMI's application for existing uses was untimely. Consequently, even assuming, *arguendo*, that KMI's application constituted a legitimate amendment of the timely application filed by Moloka'i Ranch, Kaluakoi Moloka'i, and Moloka'i Irrigation System, *Waiahole I* demonstrates that such an amendment will not preserve a party's existing uses if that party is not identified as an applicant for existing uses in the application filed within the statutory one-year deadline.

 In light of the foregoing, DHHL is correct that the Commission erred by considering KMI's untimely request for existing uses. Therefore, we vacate the Commission's Decision and Order to the extent that it grants KMI a permit for existing uses. If, on remand, KMI wishes to "revive" these expired uses, it must apply for a permit under HRS § 174C–51 as the uses are now presumed abandoned. *See* HRS § 174C–50(c).

---

12. DHHL relies on *Waiahole I* for its conclusion that late filings could not be accommodated after May 27, 1993. Indeed, we stated as follows:
 HRS § 174C–50(c) allows the Commission to accept late filings based on "just cause," but precludes the Commission from accepting late applications "more than five years after the effective date of rules implementing this chapter." The Commission promulgated the rules implementing the Code on May 27, 1988 and, thus, could not accept any late applications after May 27, 1993.
 94 Hawai'i at 166, 9 P.3d at 478.

6. *KMI requested both existing and new uses.*

DHHL also argues that despite checking the box for "existing & new uses" in its application, KMI represented at the contested case hearing that it was requesting only existing uses. Based upon KMI's repeated representations at the hearing, DHHL asserts that KMI waived any request for new uses. DHHL further contends that the Commission expressly recognized in its Decision and Order that KMI's application was for existing uses, but went ahead and granted a permit for proposed uses. DHHL avers that the Commission thereby abused its discretion and violated established practice, its own administrative rules, and principles of procedural due process.

KMI and the Commission, on the other hand, claim that KMI's application clearly indicated that the application was for existing and new uses, inasmuch as the box labeled "existing & new uses" was checked.

Preliminarily, we note that the parties do not dispute that the Commission has the authority to consider requests for existing and new uses in the same contested case hearing. Indeed, HRS § 174C–51 (Supp. 1992) states that "[t]he Commission in its discretion may allow a person to apply for several related withdrawals in the same application for a water permit." Rather, DHHL focuses on (1) the allegedly inconsistent representation of KMI's vice president, Ben Neeley ("Neeley"), and (2) the Commission's statement, in COL # 7, that KMI's request was for existing uses.

With respect to its first subargument, DHHL refers this court to a transcript of proceedings held on November 24, 1998, wherein Neeley stated that KMI's application was only for existing uses in the amount of 1.244 mgd. However, Neeley's statement, fairly viewed, did not waive KMI's request for new uses. The transcript adequately reveals KMI's position:

A The application says 2 million gallons and we've changed it.

Q So you've changed the application?

A Well, what we're applying for is 1.25. That's the way it's stated in the briefs and everything else.

. . . .

Q ... So I understand your testimony your application is for 1.244 for uses identified on the exhibit in the amounts identified on the exhibit, is that correct?

A Yes.

. . . .

Q. . . . Now, if your application is limited to uses and amounts on the exhibit, then as you said, any representation for an application in excess of 1.244 is in error, is that correct?

A Yes, we're applying for the 1.244.

Q So when KMI applied for 2 million in its initial application of 2 million gallons per day, in its amended application that was an error?

[COUNSEL FOR KMI]: I object. Objection. It's argumentative. Reasons are stated in the opening brief. I stand by my objection. We have stated in our opening brief quite simply that, you know, *we don't agree that we don't have the right to 2 million as an existing use.*

However, for purposes of this contested case hearing in large part because we understand that pumping out more than what our historical pumpage would be is a problem given the proximity of the wells, we can't pump more from that well.

We understand that's a concern for the Water Commission. *That for our opening brief and for purposes of this contested case hearing we have limited ourselves to requesting as an existing use the range of 1.259 to 1.244.* How often do I have to say that?

HEARINGS OFFICER ADLER: I understand what your application is for, I believe. And we know there have been many different moving averages in the life of this application. *You've identified what is the water that you are seeking. You ask that it be under an existing use. And I presume that in the alternative if we don't make it as an existing use you're seeking it as a new use, is that correct?*

[COUNSEL FOR KMI]: *If that's the only way we're going to get it, sure. We obviously haven't been denied simply because we are going to say it's a new use.*

(Emphases added.) Clearly, it was KMI's position that it was entitled to an allocation of 2.0 mgd of water for existing uses. However, it acknowledged the Commission's concern regarding the effects of pumpage from Well # 17 on other wells in close proximity, and voluntarily limited its request to 1.259 to 1.244 mgd of water. KMI consistently asserted that its request was for existing uses, but it asked, in the alternative, that the Commission award the requested uses as new uses if it could not satisfactorily establish them as existing at the time of designation.

Under these circumstances, we cannot say that Mr. Neeley's statements advocating KMI's primary position constituted a voluntary or intentional abandonment of KMI's alternative position. *See generally Enoka v. AIG Hawai'i Ins. Co., Inc.,* 109 Hawai'i 537, 555 n. 18, 128 P.3d 850, 868 n. 18 (2006); *Fireman's Fund Ins. Co. v. AIG Hawai'i Ins. Co., Inc.,* 109 Hawai'i 343, 354, 126 P.3d 386, 397 (2006).

As mentioned, DHHL also contends that the Commission expressly recognized that KMI's application was for existing uses. DHHL specifically refers to the Commission's COL # 7, which states that "[t]he application is for an Existing Use Permit issued under section 174C–50(b), HRS." DHHL argues that the Commission nevertheless included a section entitled, "Application for Proposed Water Use Permit," in which it evaluated KMI's request for new uses under HRS § 174C–49(a). Contrary to DHHL's assertions, however, the Commission's approach was consistent with the views it expressed in the aforequoted portion of the transcript of proceedings. To wit, the Commission understood KMI's argument to be that (1) it was entitled to 1.244 to 1.259 mgd of water for uses existing at the time of the designation of Moloka'i as a water management area, and (2) if it failed to establish that all of the water requested was for existing uses, then it desired an award of whatever remained as new uses. Hence, it was not inconsistent for the Commission to recognize that KMI requested existing uses in COL # 7 and subsequently grant new uses in accordance with KMI's alternative argument.

For these reasons, the arguments presented by DHHL are without merit.

7. *Whether the Commission lacked authority to allocate water to KMI for existing uses not claimed in its application need not be considered.*

DHHL's final point of error asserts that the Commission lacked authority to allocate water to KMI for existing uses not claimed in its application. DHHL essentially claims that KMI's failure to include certain other existing uses in its application constituted an abandonment of those uses, and as such, the Commission violated HRS § 174C–50(c) when it allocated water to these excess uses. As discussed, *supra,* because we vacate the Commission's Decision and Order to the extent that it grants KMI a permit for existing uses, and, upon remand, hold that KMI must apply for a permit under HRS § 174C–51 to "revive" its expired uses pursuant to HRS § 174C–50(c), resolution of this point of error is unnecessary.

### B. OHA's Remaining Points Of Error

1. *Pursuant to HRS § 174C–49(c), KMI may transport water from Well # 17.*

■■■ OHA asserts that the Commission erred when it concluded that KMI had correlative rights to make reasonable use of the water. The Commission, however, contends that this court continues to recognize the correlative rights rule articulated in *City Mill Co. v. Honolulu Sewer and Water Commission,* 30 Haw. 912 (Haw.Terr.1929).

This court addressed the applicability of the common law rules governing correlative rights in *Wai'ola,* 103 Hawai'i at 447, 83 P.3d at 710. Therein, we determined that "[i]nasmuch as the entire island of Moloka'i has been designated a [water management area], the common law doctrine of correlative rights is inapplicable to the present matter." *Id.* at 449, 83 P.3d at 711. Accordingly, the Commission erred when it relied on *City Mill* for the proposition that "KMI has correlative

rights to make reasonable use of the water with due regard to the rights of other co-owners in the same waters and subject to regulation by the government."

Instead, KMI's transport of water is contingent on its satisfaction of the statutory requirements enumerated in HRS § 174C–49(c) (1993). *See id.* at 449, 83 P.3d at 712. HRS § 174C–49(c) provides:

> The common law of the State notwithstanding, the commission shall allow the holder of a use permit to transport and use surgace or ground water beyond overlying land or outside the watershed from which it is taken if the commission determines that such transportation and use are consistent with the public interest and the general plans and land use policies of the State and counties.

In *Wai'ola,* this court determined that even though "the Commission did not expressly invoke HRS § 174C–49(c) ... [it] nevertheless made the necessary findings in the context of determining that MR–Wai'ola's application satisfied the conditions prescribed by HRS §§ 174C–49(a)(4), (5), and (6)." [13] 103 Hawai'i at 449, 83 P.3d at 712. We stated that the Commission's "favorabl[e] consider[ation] of the impact of the proposed use on Molokai's economy and natural environment" was sufficient for the Commission to find that the "proposed use was consistent with the public interest, as required by HRS § 174C–49(a)(4)." *Id.*

OHA contends that KMI did not prove that its transportation and use are consistent with the public interest because it failed to demonstrate that its uses met the requirements of the Safe Drinking Water Act, as argued by DHHL. However, as discussed, *supra,* the SDWA and the Code are two distinctly separate laws. Therefore, we cannot say that satisfying the requirements of one also satisfies the requirements of the other.

As in *Wai'ola,* the Commission in the instant case considered the impact that KMI's use would have on Molokai's economy and the environment. OHA does not contend that the Commission's findings in that regard are clearly erroneous. Moreover, OHA does not contend that the Commission erred when it found and concluded that KMI's uses are consistent with state and county general plans and land use designations, *see* HRS § 174C–49(a)(5), as well as county land use plans and policies. *See* HRS § 174C–49(a)(6); Consistent with *Wai'ola,* "the Commission's FOF with respect to HRS §§ 174C–49(a)(4), (5), and (6) establish the findings as set forth in HRS § 174C–49(c), requisite to allowing" KMI to transport and use water from Well # 17, which overlies the Kualapu'u Aquifer System. *See Wai'ola,* 103 Hawai'i at 449, 83 P.3d at 712.

2. *The Commission erred when it failed to consider the impact that the closing of the hotel and golf course would have on its allocation of water to KMI.*

OHA and Caparida and Kuahuia contend that the Commission erred when it refused to consider the impact that the closing of KMI's hotel and golf course would have on KMI's water use. They assert that a hotel and golf course that has been closed for many months with no announced reopening date does not present a reasonable-beneficial use under HRS § 174C–49, and as defined in HRS § 174C–3.

The Commission asserts that its decision to refuse to consider the evidence was proper in that the contested case hearing was held to determine KMI's past water usage from the date of July 15, 1992, rather than at the time of the hearing. Both KMI and the Commission urge that the Commission did not err because HRS §§ 174C–58(4) [14] and

---

13. HRS §§ 174C–49(a)(4), (5), and (6) recite the following requirements: "(a) To obtain a permit pursuant to this part, the applicant shall establish that the proposed use of water: ... (4) Is consistent with the public interest; (5) Is consistent with state and county general plans and land use designations; (6) Is consistent with county land use plans and policies[.]"

14. HRS § 174C–58(4) provides, in its entirety:
 (4) Partial or total nonuse, for reasons other than conservation, of the water allowed by the permit for a period of four continuous years or more. The commission may permanently revoke the permit as to the amount of water not in use unless the user can prove that the user's nonuse was due to extreme hardship caused by

174C–50(e) [15] (1993) permit KMI four years to fulfill its proposed uses before the Commission may suspend or revoke a permit.

In *Wai'ola*, we agreed with the Commission that HRS § 174C–58(4) "constitutes an enforcement, rather than a planning, tool." *Wai'ola*, 103 Hawai'i at 446, 83 P.3d at 709. Accordingly, "we interpret HRS § 174C–58(4) as an enforcement mechanism by which the Commission *may* suspend or revoke a water use permit upon knowledge that a permitted allocation of water, which the Commission has expected to be used within a four-year time frame, has not been utilized." *Id.* (emphasis in original).

The Commission in the instant case authorized 871,420 gd to be allocated to KMI as an interim existing use. This amount was based on the following "estimates of usage": (1) 100,000 gd allocated to the hotel, and (2) 475,600 gd allocated to the golf course.

In its final Decision and Order, the Commission issued KMI a water use permit, authorizing it to "withdraw[ ] and [make] reasonable-beneficial use of" 936,000 gd from Well # 17 as an existing use pursuant to HRS § 174C–50, and 82,000 gd from the same well as a proposed use pursuant to HRS § 174C–49. Of the 936,000 gd authorized as an existing use, 64,000 gd was allocated to the hotel, while 379,000 gd was allocated to the golf course. Of the 82,000 gd authorized as a proposed use, 3,000 gd was allocated to the hotel, while 21,000 gd was allocated to the golf course. We can discern no reasoning in the Commission's findings and conclusions to suggest that it took into consideration whether and to what extent the closing of the hotel and golf course had on its proposed use allocation decision. Indeed, the Commission's position appears to be that it need not consider this information because HRS § 174C–58(4) was "designed to provide

water use permittees with flexibility in managing their operations."

Caparida and Kuahuia contend that KMI is required to demonstrate whether and to what extent the closure of the hotel and golf course has on its existing use application. However, as discussed, *supra*, because we vacate the Commission's Decision and Order to the extent that it grants KMI a permit for existing uses, and, upon remand, hold that KMI must apply for a permit under HRS § 174C–51 to "revive" its expired uses, resolution of this issue is unnecessary.

OHA contends that the Commission's and KMI's reliance on HRS § 174C–58(4) is misplaced, inasmuch as KMI has the burden of establishing that its "proposed use" of water under HRS § 174C–49 is a "reasonable-beneficial use" as defined in HRS § 174C–3. To reiterate, HRS § 174C–3 defines a "reasonable-beneficial use" as "the use of water in such a quantity as is necessary for economic and efficient utilization, for a purpose, and in a manner which is both reasonable and consistent with the state and county land use plans and the public interest." OHA emphasizes that the closure of the hotel and golf course does not present a "purpose" that requires an allocation of water that is "necessary for economic and efficient utilization."

This court has stated that "the Commission must not relegate itself to the role of a mere 'umpire passively calling balls and strikes for adversaries appearing before it,' but instead must take the initiative in considering, protecting, and advancing public rights in the resource at every stage of the planning and decisionmaking process." *Waiahole II*, 105 Hawai'i at 16, 93 P.3d at 658 (quoting *Waiahole I*, 94 Hawai'i at 143, 9 P.3d at 455) (block format omitted). In this regard, the Commission must "prescribe a higher level of scrutiny for private commercial uses.... In practical terms, this means that the burden

factors beyond the user's control. The commission and the permittee may enter into a written agreement that, for reasons satisfactory to the commission, any period of nonuse may not apply towards the four-year revocation period. Any period of nonuse which is caused by a declaration of water shortage pursuant to section 174C–62 shall not apply towards the four-year period of forfeiture.

**15.** HRS § 174C–50(e) provides that "[t]he commission shall issue an interim permit; provided that the existing use meets the conditions of subsection (b).... Interim permits are subject to revocation under section 174C–58."

ultimately lies with those seeking or approving such uses to justify them in light of the purposes protected by the [public] trust." *Waiahole I,* 94 Hawai'i at 142, 9 P.3d at 454 (footnote, citations, and quotation marks omitted). Moreover,

> the public trust compels the state duly to consider the cumulative impact of existing and proposed diversions on trust purposes and to implement reasonable measures to mitigate this impact, including using alternative sources.... *In sum, the state may compromise public rights in the resource pursuant only to a decision made with a level of openness, diligence, and foresight commensurate with the high priority these rights command under the laws of our state.*

*Waiahole II,* 105 Hawai'i at 16, 93 P.3d at 658 (quoting *Waiahole I,* 94 Hawai'i at 143, 9 P.3d at 455) (emphasis in original).

In this connection, we cannot say that the closure of the hotel and golf course would have no impact on KMI's proposed uses in light of the Commission's findings and conclusions pursuant to the "reasonable-beneficial use" standard as set forth in HRS § 174C–49 and defined in HRS § 174C–3. Accordingly, the Commission's and KMI's reliance on HRS § 174C–58(4) is misplaced. Because the Commission failed to consider whether and to what extent the closure of the hotel and golf course would have on KMI's proposed uses when it made its proposed use allocation decision, we vacate the Commission's Decision and Order to the extent that it grants KMI a permit for proposed uses, and remand the matter for further proceedings.

> 3. *OHA's final point of error is disregarded pursuant to Hawai'i Rules of Appellate Procedure ("HRAP") Rule 28 (2002).*

■■■ OHA asserts that Yvonne Y. Izu, Esq.'s "representation" of the Commission in her capacity as a deputy attorney general when the Commission was preparing its final Decision and Order presented a conflict of interest, because her former client was in the process of purchasing the applicant in the instant case. However, OHA fails to point,

in either its points of error or argument section of its opening brief, to where in the record it suggests that a conflict of interest occurred.

HRAP Rule 28(b)(4) requires that

[e]ach point [of error] shall state: (i) the alleged error committed by the court or agency; (ii) *where in the record the alleged error occurred;* and (iii) where in the record the alleged error was objected to or the manner in which the alleged error was brought to the attention of the court or agency.

(Emphasis added.) HRAP Rule 28(b)(7) further requires that the appellant's opening brief shall contain "[t]he argument, containing the contentions of the appellant on the points presented and the reasons therefor, with citations to the authorities, statutes and *parts of the record relied on.*" (Emphasis added.)

Because OHA fails to indicate to where in the record its factual assertions are supported, this point of error is disregarded. *See* HRAP Rule 28(b)(4) ("Points not presented in accordance with this section will be disregarded, except that the appellate court at its option, may notice a plain error not presented."); HRAP Rule 28(b)(7) ("Points not argued may be deemed waived."); *Sprague v. Cal. Pac. Bankers & Ins. Ltd.,* 102 Hawai'i 189, 195, 74 P.3d 12, 18 (2003) ("It is within the appellate court's discretion whether to recognize points not presented in accordance with HRAP 28(b)(4).").

**C. Caparida's and Kuahuia's Remaining Points Of Error**

> 1. *Whether the Commission's decision was untimely pursuant to HRS § 174C–50(g) need not be considered.*

The Commission issued an interim water use permit to KMI on March 14, 1995. As a preliminary issue, Caparida and Kuahuia contend that HRS § 174C–50(g) applies and that the Commission's December 19, 2001 decision and order constituted the "final de-

termination" as described in the statute.[16] They assert that because the "final determination" was made beyond the mandated five-year time limit, the Commission was required to evaluate KMI's existing use application as a proposed use under HRS § 174C–49(a),[17] rather than as an existing use under HRS § 174C–50(b).[18] However, KMI and the Commission assert that the statute's absence of consequences for failing to comply with the time requirement should be construed as requiring neither a denial of KMI's application, nor different statutory criteria to be applied to the application after the five-year deadline.

As discussed, *supra,* because we vacate the Commission's Decision and Order to the extent that it grants KMI a permit for existing uses, and, upon remand, hold that KMI must apply for a permit under HRS § 174C–51 to "revive" its expired uses, resolution of this point of error is unnecessary.

2. *The Commission impermissibly shifted the burden of proving harm from KMI to Caparida and Kuahuia.*

■■■■ Caparida and Kuahuia assert that the Commission erred because it impermissibly shifted the burden of proving harm to those claiming a right to exercise a tradition-al and customary native Hawaiian practice. KMI asserts that it satisfied its burden of proof through the testimony of its expert witnesses. The Commission entered, based on this testimony, the following FOF No. 163:

Assuming all other things being constant, if there is no increase in the amount of water being pumped by Well 17, there will be no decrease in the amount of water that discharges into the marine environment as a result of the continued pumpage of Well 17 at status quo levels. Hence, there would be no impact on the marine environment as it now exists as a result of KMI's continued pumpage of Well 17 at status quo levels.

Article XII, section 7 of the Hawai'i Constitution provides:

The State reaffirms and shall protect all rights, customarily and traditionally exercised for subsistence, cultural and religious purposes and possessed by ahupua'a tenants who are descendants of native Hawaiians who inhabited the Hawaiian Islands prior to 1778, subject to the right of the State to regulate such rights.

■■■■■■ The protection of traditional and customary native Hawaiian rights is also pro-

---

16. HRS § 174C–50(g) provides, in its entirety:

(g) If an interim permit is issued pending verification of the actual quantity of water being consumed under the existing use, a final determination of that quantity shall be made within five years of the filing of the application to continue the existing use. In the final determination, the commission may increase or reduce the amount initially granted the permittee.

17. HRS § 174C–49(a) provides, in its entirety:

(a) To obtain a permit pursuant to this part, the applicant shall establish that the proposed use of water:
(1) Can be accommodated with the available water source;
(2) Is a reasonable-beneficial use as defined in section 174C–3;
(3) Will not interfere with any existing legal use of water;
(4) Is consistent with the public interest;
(5) Is consistent with state and county general plans and land use designations;
(6) Is consistent with county land use plans and policies; and
(7) Will not interfere with the rights of the department of Hawaiian home lands as pro-

vided in section 221 of the Hawaiian Homes Commission Act.

18. HRS § 174C–50(b) provides, in its entirety:

(b) After publication as provided in section 174C–52, the commission shall issue a permit for the continuation of a use in existence on July 1, 1987, if the criteria in subsection (a) are met and the existing use is reasonable and beneficial.
Whether the existing use is a reasonable-beneficial use and is allowable under the common law of the State shall be determined by the commission after a hearing; provided that the commission may make such a determination without a hearing, if the quantity of water applied for does not exceed an amount per month established by rule or if the quantity of water applied for exceeds an amount per month established by rule, but no objection to the application is filed by any person having standing to file an objection. In determining whether an application does not exceed the amount per month established by rule, the commission shall consider an average of water use over the three-month period immediately preceding the filing of the application.

vided for in the Code under HRS §§ 174C–2(c) and 174C–101(c) and (d) (1993).[19] Additionally, this court has upheld "the exercise of Native Hawaiian and traditional and customary rights as a public trust purpose." *Waiahole I*, 94 Hawai'i at 137, 9 P.3d at 449 (citing Haw. Const. art. XII, § 7; *Public Access Shoreline Hawai'i v. County Planning Commission ("PASH")*, 79 Hawai'i 425, 903 P.2d 1246 (1995), *cert. denied*, 517 U.S. 1163, 116 S.Ct. 1559, 134 L.Ed.2d 660 (1996); *Kalipi v. Hawaiian Trust Co.*, 66 Haw. 1, 656 P.2d 745 (1982)). Although "the state water resources trust acknowledges that private use for economic development may produce important public benefits and that such benefits must figure into any balancing of competing interests in water, it stops short of embracing private commercial use as a protected trust purpose." *Id.* at 138, 9 P.3d at 450. Therefore, to the extent that "the public trust ... establishes use consistent with trust purposes as the norm or 'default' condition, ... it effectively prescribes a 'higher level of scrutiny' for private commercial uses." *Id.* at 142, 9 P.3d at 454 (footnote omitted). In this regard, "the burden ultimately lies with those seeking or approving such uses to justify them in light of the purposes protected by the trust." *Id.*

The Commission found and concluded in its Decision and Order that "[t]he gathering of crab, fish, limu, and octopus are traditional and customary practices that have persisted on Moloka'i for generations." The population of the island of Moloka'i consists primarily of Hawaiians, many of whom "rely on the natural resources of the land and ocean[ ]" for such "subsistence activities" that include

"gathering of marine resources including fish, shellfish, 'ula, he'e and limu to feed their 'ohana (extended family)."

The Commission also found and concluded that groundwater is a source of nutrients for such plants as the limu, and fresh water is a "necessary and integral part of the live food pyramid" for certain fish species that feed on phytoplankton. Additionally, there are springs located throughout the shoreline that "create a nursery habitat of indeterminate size." However, the Commission concluded that it "is impossible to determine what the precise effect will be if the freshwater is reduced by a certain amount, because you don't know which springs the reduction is going to affect[,]" and "it is difficult to determine the exact percentage of freshwater required to create and maintain a viable and healthy nursery habitat." Possibly, "[s]mall nursery habitats may spring up wherever freshwater comes up from the ground, and collectively form a large nursery habitat."

Caparida and Kuahuia contended before the Commission, as they do here, that a reduction of marine life, if severe enough, will diminish their ability to practice their traditional and customary native Hawaiian gathering rights even if access is not impaired by KMI's proposed use. In response, however, the Commission merely observed that the "[p]otential adverse impacts of the current level of ground water pumpage on the ground water flux at the coastline in support of [the] natural habitat should already be visible." As such, the "[e]vidence does not show that nearshore resources are

---

19. HRS § 174C–2(c) provides, in its entirety:

> (c) The state water code shall be liberally interpreted to obtain maximum beneficial use of the waters of the State for purposes such as domestic uses, aquaculture uses, irrigation and other agricultural uses, power development, and commercial and industrial uses. However, adequate provision shall be made for the protection of traditional and customary Hawaiian rights, the protection and procreation of fish and wildlife, the maintenance of proper ecological balance and scenic uses, public recreation, public water supply, agriculture, and navigation. Such objectives are declared to be in the public interest.
>
> HRS § 174C–101(c) and (d) provides, in its entirety:

> (c) Traditional and customary rights of ahupua'a tenants who are descendants of native Hawaiians who inhabited the Hawaiian Islands prior to 1778 shall not be abridged or denied by this chapter. Such traditional and customary rights shall include, but not be limited to, the cultivation or propogation of taro on one's own kuleana and the gathering of hihiwai, opae, o'opu, limu, thatch, ti leaf, aho cord, and medicinal plants for subsistence, cultural, and religious purposes.
>
> (d) The appurtenant water rights of kuleana and taro lands, along with those traditional and customary rights assured in this section, shall not be diminished or extinguished by a failure to apply for or to receive a permit under this chapter.

in decline, that ground water flux has changed over the course of historic pumpage, or that any such change should be considered anything more than one of a number of potentially causative factors if the biological resources do indeed decline." Indeed, in its COL # 40, the Commission concluded that

> no evidence was presented that the use of water from Well 17 would adversely affect the exercise of traditional and customary native Hawaiian rights. Nor does the Commission conclude that any evidence was presented that the existing or proposed uses would adversely affect any access to the shoreline or the nearshore areas. Therefore, the Commission concludes that the allocation will not in any way diminish access for traditional and customary native Hawaiian practices in the project area, shoreline, or nearshore areas.

In *Wai'ola*, this court reviewed a similar decision made by the Commission.[20] Therein, we held that "an applicant for a water use permit bears the burden of establishing that the proposed use will not interfere with any public trust purposes; likewise, the Commission is duty bound to hold an applicant to its burden during a contested-case hearing." 103 Hawai'i at 441, 83 P.3d at 704. This obligates the applicant

> to demonstrate affirmatively that the proposed well would not affect native Hawaiian's rights; in other words, *the absence of evidence* that the proposed use would affect native Hawaiian's rights *was insufficient to meet the burden imposed* upon [the applicant] by the public trust doctrine, the Hawai'i Constitution, and the Code.

*Id.* at 442, 83 P.3d at 705 (emphases added and omitted). Through the foregoing, we determined that the Commission's conclusion of law "was unsupported by any clearly articulated FOF and erroneously placed the burden on the Intervenors to establish that the proposed use would abridge or deny their

traditional and customary gathering rights." *Id.*

Similarly, the Commission's FOF # 163 and COL # 40 in the instant case are insufficiently clear when read with its FOF # 154 and # 155, which found the following:

> 154. There is a statistical curve which those in fisheries refer to as the maximum sustainable yield. This is a general curve which could be used to show overall productivity for fish, rather than a specific species of fish. The object is to stay just below the curve so that the resource is continuously being naturally replenished. If you are below the curve, you could increase the amount of freshwater being taken out of the aquifer. But if you are above [the] curve or the maximum sustainable yield, the result will be a change in the habitat. The difficulty is determining where one is on the curve. One way to determine this is monitoring. A decrease of abundance will signal a change of habitat.

> 155. *With baseline information, how much water may be withdrawn without negative effects could be better determined. Baseline information does not currently exist.*

(Emphasis added.) Furthermore, the Commission's conclusion that "no evidence was presented" to suggest that the rights of native Hawaiians would be adversely affected erroneously shifted the burden of proof to Caparida and Kuahuia. *See Wai'ola,* 103 Hawai'i at 442, 83 P.3d at 705. Accordingly, we hold that the Commission failed to adhere to the proper burden of proof standard to maintain the protection of native Hawaiians' traditional and customary gathering rights in discharging its public trust obligation. *See id.* at 443, 83 P.3d at 706.

---

20. Specifically, in *Wai'ola,* the Commission concluded in its "COL No. 24":

> that no evidence was presented that the drilling of the well would affect the exercise of traditional and customary native Hawaiian rights. Nor does the Commission find that any evidence was presented that the proposed use will affect any access to the shoreline or the

> nearshore areas. Therefore, the Commission finds that the proposed use will not in any way diminish access for the purpose of practicing traditional and customary native Hawaiian rights in the project area, shoreline, or nearshore areas.

103 Hawai'i at 442, 83 P.3d at 705.

510

## IV. CONCLUSION

Based upon the foregoing analysis, we vacate the Commission's final decision and order filed on December 19, 2001, and remand for further proceedings consistent with this opinion.